ORIGINAL

AO 91 (Rev. 11/82)

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|

| UNITED STATES OF AMERICA<br>v.<br>BENJAMIN MEIR | DOCKET NO. |
|---|---|
| | MAGISTRATE'S CASE NO.<br>19MJ01008 |

Complaint for violation of Title 21, United States Code, Section 841(a)(1)

| NAME OF MAGISTRATE JUDGE<br>THE HONORABLE ALKA SAGAR | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, California |
|---|---|---|

| DATE OF OFFENSE<br>May 11, 2019 | PLACE OF OFFENSE<br>Los Angeles County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

FILED
CLERK, U.S. DISTRICT COURT
MAR 1 2 2019
CENTRAL DISTRICT OF CALIFORNIA
BY                    DEPUTY

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

[21 U.S.C. § 841(a)(1)]

On or about March 11, 2019, BENJAMIN MEIR knowingly possessed with the intent to distribute a controlled substance.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:  N/A

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>**DAVID SCHWARTZ** |
|---|---|
| | OFFICIAL TITLE<br>Special Agent – U.S. Secret Service |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1)             ALKA SAGAR | DATE<br>March 12, 2019 |
|---|---|

(1) See Federal Rules of Criminal Procedure 3 and 54

AUSA Roger A. Hsieh x0600          REC: Detention

## AFFIDAVIT

I, David Schwartz, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Valerie Ramirez ("RAMIREZ"), Benjamin Meir ("MEIR"), Brittany Barbour ("BARBOUR"), and Nanar Aprahamian ("APRAHAMIAN") for a violation 21 U.S.C. § 841(a)(1) (possession with intent to distribute a controlled substance).

2.    This affidavit is made in support of a search warrant to search the following:

      a.    Three cars (the "SUBJECT VEHICLES") found at 8419 Wakefield Ave., Panorama City, California 91402, as described more fully in Attachment A-1;

      b.    A storage locker (the "STORAGE LOCKER") located at Studio Self Storage, 6200 Lankershim Blvd., North Hollywood, California 91606, as described more fully in Attachment A-2; and

      c.    A safe deposit box (the "SAFE DEPOSIT BOX") located at U.S. Private Vaults, 9182 West Olympic Blvd., Beverly Hills, California 90212, as described more fully in Attachment A-3.

3.    The requested search warrants seeks authorization to seize evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and manufacture controlled substances), 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances), 21 U.S.C § 953 (exportation of controlled substances), 18 U.S.C. § 1343 (wire

fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 2 (aiding and abetting), 18 U.S.C. § 1956 (laundering of monetary instruments), 18 U.S.C. § 1957 (engaging in monetary transactions in property from specified unlawful activity), 18 U.S.C. § 922(g) (felon in possession of a firearm and ammunition), 18 U.S.C. § 924(c) (possession of a firearm in furtherance of drug trafficking), and 18 U.S.C. § 371 (conspiracy) (the "SUBJECT OFFENSES").

4.    This affidavit is also submitted in support of an application for a combined criminal and civil forfeiture seizure warrant for the following assets, including all funds -- currency, cryptocurrency, private keys, and recovery seeds -- that may be located during execution of the requested search warrants, as well as all such items stored in, or accessible via, wallets for digital currency controlled by RABULAN, GOLDBERG, KUEKER, RAMIREZ, MEIR, BARBOUR, and APRAHAMIAN in the Central District of California.

## II. BACKGROUND OF AGENT

5.    I am a Special Agent ("SA") with the Department of Homeland Security, United States Secret Service ("USSS"), and have been so employed since April 2016.  As an SA with the USSS, I am responsible for investigating violations of federal law, primarily involving financial crimes and cybercrimes, including bank fraud, wire fraud, identity theft, operation of unlicensed money transmitting businesses, money laundering, and investigations involving the Dark Net.  I am currently assigned to the Los Angeles Electronic Crimes Task Force, which is

responsible for investigating cybercrimes, including crimes related to criminal activity on the Dark Net, cyber-enabled fraud, and network intrusions.

6.      I am a graduate of the Criminal Investigator Training Program conducted at the Federal Law Enforcement Training Center in Glynco, Georgia.  I have received additional law enforcement training from the USSS Special Agent Investigator Training Course in Beltsville, Maryland.  I have investigated cases involving the operation of unlicensed cryptocurrency exchanges, illicit Dark Net activity, as well as fraud.  I have conducted physical and electronic surveillance, interviewed witnesses, interviewed informants, conducted undercover operations, prepared and participated in the execution of search and arrest warrants, and gathered evidence.  I have also received training in dug investigations and participated in investigations related to the trafficking in controlled substances.

7.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaints and search warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

8.    On March 1, 2019, the Honorable Alka Sagar, United
States Magistrate Judge authorized a complaint and warrants for
the arrest of RABULAN, GOLDBERG, and KUEKER, for a violation of
21 U.S.C. § 846 (conspiracy and attempt to distribute controlled
substances).  Judge Sagar also authorized search warrants for
RABULAN's residence at 8419 Wakefield Ave., Panorama City, CA
91402 ("Subject Premises 1"), and KUEKER's two residences at
12029 Tiara Street, Valley Village, CA 91607 ("Subject Premises
2") and 2275 Vasanta Way, Los Angeles, CA 90068 ("Subject
Premises 3").

9.    On March 11, 2019, law enforcement executed federal
search warrants at Subject Premises 1, Subject Premises 2, and
Subject Premises 3 for evidence of drug, fraud, and money
laundering offenses.  At Subject Premises 1, law enforcement
found a Nano Leger used to store cryptocurrency and a semi-
automatic firearm in RABULAN's bedroom, approximately 22 grams
of suspected methamphetamine in an office area outside of
RABULAN's bedroom, and approximately $4,000 in cash in RABULAN's
purse.  Law enforcement also found the SUBJECT VEHICLES parked
in the garage and driveway of Subject Premises 1.

10.   At Subject Premises 2, law enforcement found
distribution quantities of suspected methamphetamine and cocaine
in RAMIREZ's bedroom; suspected ketamine, MDMA, and alprazolam
pills; multiple gallon containers containing suspected GHB; and
a clandestine lab in a shed that I believe was used to
manufacture controlled substances.  Law enforcement also found

4

the rental agreement for the STORAGE LOCKER in the downstairs bedroom closet of Subject Premises 2.

11.    At Subject Premises 3, law enforcement found over $25,000 in cash and distribution quantities of suspected MDMA, psilocybin, GHB, black tar heroin, and other substances in a safe in BARBOUR's bedroom, a distribution quantity of suspected ketamine next to a scale in MEIR's bedroom, distribution quantities of suspected drugs in APRAHAMIAN's purse, and a lab in the basement that I believe was used to manufacture controlled substances.  In KUEKER's bedroom, law enforcement found an AK-47 style rifle, suspected methamphetamine, and a receipt and registration letter for the SAFE DEPOSIT BOX.

### IV. STATEMENT OF PROBABLE CAUSE

**A.    Search Warrants for Subject Premises 1, 2, and 3**

12.    On March 1, 2019, the Honorable Alka Sagar, United States Magistrate Judge authorized the arrest of RABULAN, GOLDBERG, and KUEKER for a violation of 21 U.S.C. § 846 and a search of Subject Premises 1-3 for evidence of drug, fraud, and money laundering offenses and forfeiture.  Case Nos. 19-MJ-00784 to 00787.  The search warrants for Subject Premises 1, 2, and 3, authorized seizure of "records associated with storage units such as records of payment, rental agreements and storage unit keys."  The underlying affidavit and attachments for the search warrant application for Subject Premises 2 is attached hereto as Exhibit 1 and incorporated herein by reference.  The affidavits for Subject Premises 1 and 3 are the same with the exception of Attachment A, the description of the premises to be searched.

13.   In summary, the affidavit at Exhibit 1 sets forth RABULAN and GOLDBERG's scheme to ship multiple kilograms of methamphetamine from Southern California to international destinations; KUEKER's role in collecting and safekeeping drug proceeds at his residence and in destroying and hiding evidence of the drug trafficking conspiracy; and KUEKER's use of a fraudulent driver's license to write a check to GOLDBERG.   The affidavit also set forth probable cause that RABULAN resides at Subject Premises 1, a home she previously shared with GOLDBERG, and that KUEKER resides at both Subject Premises 2 and Subject Premises 3.

**B.   Drugs and SUBJECT VEHICLES Found at Subject Premises 1**

14.   On March 11, 2019, law enforcement executed the above-referenced search warrants.   Based on my conversation with HSI SA Andrew Kim, I understand that at Subject Premises 1, law enforcement found and arrested RABULAN.   In RABULAN's bedroom, law enforcement found a Nano Leger used to store cryptocurrency in a dresser drawer and a semi-automatic firearm and two loaded magazines in the closet.   In a purse containing keys to two of the SUBJECT VEHICLES, including a vehicle registered to RABULAN, law enforcement found $4,000 in cash.   Law enforcement found approximately 22 grams of suspected methamphetamine in an office area outside of RABULAN's bedroom.

15.   In the garage of Subject Premises 1, law enforcement found one of the SUBJECT VEHICLES a 2013 Maserati Grand Turismo. Law enforcement found the other two SUBJECT VEHICLES on the driveway of Subject Premises 1, a 2012 Land Rover Range Rover

registered to RABULAN and a 2012 Mercedes CLS 550 registered to GOLDBERG.[1]

### C. Drugs, a Drug Lab, and Records for the STORAGE LOCKER Found at Subject Premises 2

16. Based on my conversation with HSI SA Christopher Hicks, I understand that law enforcement executed a search warrant at Subject Premises 2 on March 11, 2019. During the search, law enforcement found an upstairs bedroom with women's clothing that RAMIREZ identified as her bedroom. In RAMIREZ's bedroom, law enforcement found approximately 462 grams of suspected methamphetamine in a plastic bag near the bed and approximately 306 grams of suspected cocaine in a nightstand drawer. Law enforcement also found additional suspected controlled substances including approximately 358 grams of ketamine, 345 grams of MDMA, and 820 alprazolam pills. In a post-Miranda interview, RAMIREZ stated that she shipped 6 packages for KUEKER and was not certain whether those shipments contained drugs because she did not want to know.[2] Law enforcement also found gallon containers containing suspected GHB in the kitchen and in the downstairs bedroom.

17. In a shed in the backyard of Subject Premises 2, law enforcement found a lab behind a false wall that SA Hicks believes was used to manufacture controlled substances. SA Hicks is experienced in investigating drug labs. The lab

---

[1] Law enforcement seized, towed, and inventoried the SUBJECT VEHICLES. I do not rely on items found during that seizure and inventory search for probable cause in this search warrant.

[2] I do not rely on RAMIREZ's pre-Miranda for probable cause in this affidavit.

included beakers, stirrers, and chemicals. Law enforcement also found the rental agreement for the STORAGE LOCKER in the downstairs bedroom closet of Subject Premises 2. The rental agreement lists KUEKER as the renter of the STORAGE LOCKER and is dated October 3, 2018.

18. As stated in greater detail in Exhibit 1, KUEKER assisted GOLDBERG and RABULAN with the drug trafficking operation by collecting and safekeeping drug proceeds, moving and destroying evidence, and by hiding GOLDBERG and RABULAN's assets from the federal government. Exhibit 1 also sets forth KUEKER's use of a fraudulent driver's license to write a $30,000 fraudulent check to GOLDBERG.

19. On March 11, 2019, HSI Special Agents Conan Chang and Jung Cho went to Studio Self Storage, 6200 Lankershim Blvd., North Hollywood, CA 91606. An employee at Studio Self Storage confirmed that storage space number 433 is active and rented by KUEKER.

### D.   Drugs, a Drug Lab, and Records for the SAFE DEPOSIT BOX Found at Subject Premises 3

20. I executed the federal search warrant of Subject Premises 3 on March 11, 2019, with the assistance of other law enforcement officers. In the bedroom identified by KEUKER as his, I saw an AK-47 style rifle and suspected methamphetamine and ketamine. In the bathroom connected to KEUKER's bedroom, law enforcement found KEUKER's California driver's license and social security card. In KUEKER's bedroom, law enforcement found a receipt and registration information showing that KUEKER

rented the SAFE DEPOSIT BOX from U.S. Private Vaults in Beverly
Hills, California.   The registration letter listed KUEKER's
name, Subject Premises 2 as his address, and is dated August 23,
2018.   The receipt, also dated August 23, 2018, shows that
$866.60 was paid for the SAFE DEPOSIT BOX, and an expiration
date of August 30, 2019.   The receipt also shows insurance
coverage for $80,000.

21.   I also found a suspected clandestine laboratory used
to produce a controlled substance in the basement with beakers,
chemicals, automated stirrers, and a commercial extraction oven.
Law enforcement arrested KUEKER pursuant to an arrest warrant.

22.   MEIR provided me the location of his room.   In MEIR's
room, I saw distribution quantities of suspected methamphetamine
(totaling approximately 28.85 grams) packaged for sale, 94 pills
of alprazolam, and multiple other unidentified controlled
substances.   There was approximately 114 grams of suspected
ketamine next to a digital scale on top of MEIR's dresser.   On
the dresser near the suspected ketamine, I saw a California
driver's license bearing MEIR's photograph but with a different
name.   I also saw a notebook on MEIR's bed that contained what I
believe to be keys for cyptocurrency and a ledger recording
sales of alprazolam.   Throughout the room, I saw several pieces
of mail and bills bearing MEIR's name.

23.   BARBOUR provided me the location of her room.   Inside
BARBOUR's room, I found a safe that contained approximately
$25,150 in U.S. Currency and distribution quantities of
suspected controlled substances including approximately 1,049

grams of MDMA, 43 grams of psilocybin, 240 grams of GHB, 296 grams of ketamine, 53 alprazolam pills, 21 LSD blotters, and 43 grams of black tar heroin.   Inside the safe, I found prescription medication bottles bearing BARBOUR's name.   I also found a cell phone in BARBOUR's room that she identified as hers.   Law enforcement placed BARBOUR under arrest based on probable cause for a violation of 21 U.S.C. § 841(a)(1).   Prior to her transport, BARBOUR asked for her clothing from her room that contained the safe.

24.   As agents entered Subject Premises 3, they saw APRAHAMIAN holding a blue purse (the "purse").   The purse contained 30.7 grams of suspected cocaine, 4.95 grams of ketamine, and 0.7 grams of MDA packaged in user quantities for distribution.   The purse also contained approximately $3,475.00 in U.S. currency and a California driver's license bearing an image of APRAHAMIAN.   On March 11, 2019, I conducted a query of a law enforcement database and confirmed that the driver's license found in the purse was issued to APRAHAMIAN.   In a post-Miranda interview, APRAHAMIAN stated that she had owned the purse since May of 2018 and that she was "just holding on to them" when asked about the controlled substances found in the purse.

## V.  FORFEITURE

25.   For the reasons set forth in the affidavit in Exhibit 1 and herein, I submit that there is probable cause to believe that the cash and cryptocurrency constitute property involved in a transaction or attempted transaction in violation

10

of 18 U.S.C. § 1956 and 18 U.S.C. § 1957, or are traceable to such property, and are, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1) (civil forfeiture) and pursuant to 18 U.S.C. § 982(a)(1) (criminal forfeiture).

26. I moreover submit that there is probable cause to believe that cryptocurrency constitutes (1) money, negotiable instruments, securities or other things of value furnished or intended to be furnished in exchange for a controlled substance in violation of the Controlled Substances Act; (2) proceeds traceable to such an exchange; or (3) money, negotiable instruments, or securities used and intended to be used to facilitate a violation of the Controlled Substances Act. The cryptocurrency is therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 881(a)(6) (civil forfeiture) and pursuant to 18 U.S.C. § 982(a)(1) (criminal forfeiture).

27. Finally, I submit there is probable cause to believe that cash and cryptocurrency constitute property constituting, or derived from, any proceeds obtained, directly or indirectly, as the result of drug trafficking, and are therefore subject to forfeiture to the United States pursuant to 21 U.S.C. § 853(a) (criminal forfeiture). As property subject to forfeiture, these items may be seized pursuant to 18 U.S.C. § 981(b) and 21 U.S.C. § 853(f).

28. With respect to seizure, 21 U.S.C. § 853(f) specifically provides that a court may issue a criminal seizure warrant when it "determines that there is probable cause to

believe that the property to be seized would, in the event of conviction, be subject to forfeiture and that a protective order under 21 U.S.C. § 853(e) may not be sufficient to assure the availability of the property for forfeiture." For the reasons described below, I submit that a protective order under 21 U.S.C. § 853(e) would not be sufficient to assure the availability of the cash for forfeiture.

29. As further set forth below, there is a substantial risk that RABULAN's/GOLDBERG's/KUEKER's/RAMIREZ's/MEIR's/BARBOUR's/APRAHAMIAN's cryptocurrency will dissipate or otherwise become unavailable for forfeiture unless immediate steps are taken, upon the execution of the requested searches, to secure RABULAN's/GOLDBERG's/KUEKER's/RAMIREZ's/MEIR's/BARBOUR's/APRAHAMIAN's cryptocurrency(ies).

30. Thus, I seek authority to (1) compel RABULAN, GOLDBERG, KUEKER, RAMIREZ, MEIR, BARBOUR, and APRAHAMIAN to put one or more of their fingers on their cell phone(s) to unlock the device(s); and (2) access their wallets (via applications on RABULAN's, GOLDBERG's, KUEKER's, RAMIREZ's, MEIR's, BARBOUR's, and APRAHAMIAN's cell phone(s)) for the purpose of transferring all of RABULAN's, GOLDBERG's, KUEKER's, RAMIREZ's, MEIR's, BARBOUR's, and/or APRAHAMIAN's bitcoin or other cryptocurrency stored in or accessible via their wallets to a law enforcement-controlled bitcoin/cryptocurrency wallet. The seized cryptocurrency will then be preserved pending further forfeiture proceedings.

31.  Per this affidavit and associated warrant
applications, the government also seeks authorization to search
RABULAN's, GOLDBERG's, KUEKER's, RAMIREZ's, MEIR's, BARBOUR's,
and APRAHAMIAN's cell phones, digital devices such as iPads and
computers, and cold storage devices, for, among other things,
any additional bitcoin or cryptocurrency wallets for the purpose
of seeking any additional follow-up wallets if appropriate.

## VI. TRAINING AND EXPERIENCE ON DRUG TRAFFICKING AND MONEY LAUNDERING

32.  Based on my training and experience and familiarity
with investigations into drug trafficking conducted by other law
enforcement agents, I know the following:

a.  Drug trafficking is a business that involves
numerous co-conspirators, from lower-level dealers to higher-
level suppliers, as well as associates to manufacture, process,
package, and deliver the drugs and launder the drug proceeds.
Drug traffickers often travel by car, bus, train, or airplane,
both domestically and to foreign countries, in connection with
their illegal activities in order to meet with co-conspirators,
conduct drug transactions, and transport drugs or drug proceeds.

b.  Drug traffickers often maintain books, receipts,
notes, ledgers, bank records, and other records relating to the
manufacture, transportation, ordering, sale and distribution of
illegal drugs.  The aforementioned records are often maintained
where drug traffickers have ready access to them, such as on
their cell phones and other digital devices, and in their
residences and vehicles.  Such contacts and records are valuable

to drug traffickers and thus also retained in storage lockers and safe deposit boxes, often to shield them from discovery by law enforcement.

  c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices. This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal. In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

  d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices and in their residence, cars, storages lockers, and safe deposit boses. Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices and in their residence, vehicles, and storage lockers and safe deposit boxes, including in the form of calendar entries and location data.

  e. Drug traffickers often use vehicles to transport their drugs and may keep stashes of drugs in their vehicles, safe deposit boxes, and storage lockers, in the event of an unexpected opportunity to sell drugs arises.

f.    Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences, vehicles, storage lockers, and safe deposit boxes.

g.    Drug traffickers often keep drugs in places where they have ready access and control, such as at their residence, vehicles, safe deposit boxes, and storage lockers.  They also often keep other items related to their drug trafficking activities at their residence, vehicles, and storage facilities, such as digital scales, packaging materials, and proceeds of drug trafficking.

h.    It is common for drug traffickers to own multiple phones of varying sophistication and cost as a method to diversify communications between various customers and suppliers.  These phones range from sophisticated smart phones using digital communications applications such as Blackberry Messenger, WhatsApp, and the like, to cheap, simple, and often prepaid flip phones, known colloquially as "drop phones," for actual voice communications.  Such phones are kept in their residences, vehicles, and often retained in their storage lockers and safe deposit boxes.

33.  Drug dealing is a cash business.  Customers pay for drugs with cash and dealers commonly purchase drugs from their suppliers with cash.  Drug dealers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from

drug sales or are intended for the purchase controlled substances.  When drug dealers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, drug dealers often use different techniques, including the use of foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  Drug dealers also purchase real estate or vehicles and establish shell corporations and business fronts that they use to launder drug proceeds.  Drug dealers often use fictitious or "straw-holder" owners to conceal the true ownership, vehicles, or other valuable items purchased with the proceeds of illicit drug sales.  In addition, drug dealers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business.  Drug dealers often keep these items of value, and records relating to them, on their person or in their residences, stash houses, vehicle, storage lockers, and safe deposit boxes where they are concealed from law enforcement but can be made available.

34.  Drug dealers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to

reduce their risk of arrest during the transportation of drugs from one place to another.  They often use hand-written airbills, drop the packages near closing time, pay for such services in cash and use false or nominee names, addresses, and/or telephone numbers when using such services in order to further insulate themselves from detection by law enforcement. Drug dealers frequently maintain records relating to their use of these services, such as receipts, copies of airbills, empty and/or previously used boxes, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, in their vehicles where they are available for reference, or retained in storage lockers and safe deposit boxes.

35.  With respect to money launderers, I know money launderers can maintain large sums of cash in multiple locations that are within their control such as residences, vehicles, storage lockers, and safe deposit boxes.  This allows launderers to quickly disperse cash to their clients if the need arises.  I know money launderers often establish businesses that are service businesses or "cash businesses" in order to more easily hide or otherwise obscure the true earnings of said businesses— which are typically much lower than reported to government entities, such as the Internal Revenue Service or state tax department.  A business such as this allows launderers to place, conceal, and cycle ill-gotten cash proceeds through such a business with greater ease as compared to a business that is

heavily regulated or predominantly works with traceable funds
(such as wire transfers, cashier's checks, personal checks, and
credit card transactions).

36. Businesses aside, I know money launderers also use
other methods of laundering, such as the use of funnel bank
accounts, wire transfers, or currency exchanges to conduct their
money laundering activities. In the instance of using bank
accounts or funnel bank accounts, launderers will work to keep
their transaction amounts under the $10,000 threshold that would
trigger a Cash Transaction Record with financial regulators. In
this instance, money launderers will often use a number of
people (or "smurfs" or "runners") to place these sub-$10,000
increments into a bank account or accounts.

37. Based on my training and experience, and conversations
with other law enforcement personal who have been trained
specifically in cryptocurrency methods used by drug traffickers
and money launderers, traffickers and money launderers will, at
times, use cryptocurrency and cryptocurrency exchanges in an
effort to thwart and evade law enforcement due to the encryption
and anonymity many cryptocurrency services provide.
Additionally, this currency can be moved very quickly, across
the planet, which makes it even more attractive to money
launderers.

38. Finally, I know that the commission of the SUBJECT
OFFENSES in the manner set forth above necessarily requires the
use of computers, smart phones, tablets, or other computer
devices and storage media for the perpetrator to access dark web

marketplaces and cryptocurrency exchanges and wallets, connect with customers, and co-conspirators, and engage in transfers of digital currency. I have learned through training and experience that individuals who engage in the SUBJECT OFFENSES in this way also commonly use such electronic devices to keep track of suppliers, customers and co-conspirators, keep records of illegal transactions and criminal proceeds, and store copies of online chats, emails, and other data. In addition, I know, based on training and experience that perpetrators maintain copies of software programs and other applications to assist with accessing the dark web and running a vendor account, including, but not limited to, Tor browser software, cryptocurrency client and wallet files, digital signature software and related authentication keys, as well as encryption software and related encryption keys. In such cases, I know that perpetrators often keep such electronic devices inside their homes. In the case of smart phones, tablets, and laptop computers, perpetrators may also keep such devices on their person, either in their pockets or in containers such as carrying bags, cases, backpacks or protective sleeves, or in their vehicles, or retained in safe deposit boxes and storage lockers.

39. Because RABULAN, GOLDBERG, KUEKER, RAMIREZ, MEIR, BARBOUR, and APRAHAMIAN's crimes involve the use of cryptocurrency and encryption, the items to be seized could be stored in vehicles, storage lockers, and safe deposit boxes in both physical and electronic formats. For example, Attachment B seeks cryptocurrency addresses, private keys, recovery seeds,

PGP keys, and passwords. These pieces of data comprise long and complex character strings, and in my training and experience I know that many cryptocurrency users write down or otherwise record and store such items because they are too long to commit to memory. As such, these keys, passwords, and addresses may be documented in writing and secreted anywhere within a residence. For all of the foregoing reasons, your affiant respectfully submits that probable cause exists to believe that such records, data, and documents will be found within the premises to be searched, including in computers or on other devices that store electronic data.

### VII. TRAINING AND EXPERIENCE ON FIREARMS OFFENSES

40. From my training, personal experience, and the collective experiences related to me by other law enforcement officers who conduct who conduct firearms investigations, I am aware of the following:

a. Persons who possess, purchase, or sell firearms generally maintain records of their firearm transactions as items of value and usually keep them in their residence, or in places that are readily accessible such as a storage unit of safety deposit box, and under their physical control, such in their digital devices. It has been my experience that prohibited individuals who own firearms illegally will keep the contact information of the individual who is supplying firearms to prohibited individuals or other individuals involved in criminal activities for future purchases or referrals. Such information is also kept on digital devices.

b.    Those who illegally possess firearms often sell their firearms and purchase firearms.  Correspondence between persons buying and selling firearms often occurs over phone calls, e-mail, text message, and social media message to and from smartphones, laptops, or other digital devices.

c.    Individuals engaged in the illegal purchase or sale of firearms and other contraband often use multiple digital devices.

## VIII.    TRAINING AND EXPERIENCE REGARDING FRAUD AND IDENTITY THEFT

41.   Based on my training and experience and information obtained from other law enforcement officers who investigate mail and identity theft, I know the following:

a.    It is a common practice for those involved in access device fraud to use either false identification or stolen real identification to make purchases with stolen access devices at retail stores in order to avoid detection and to complete the transaction.  Those who engage in such fraud keep evidence of such retail transactions in their homes and cars.

b.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards. Software relevant to such schemes can often be found on digital

devices, such as computers.  Such equipment and software are
often found in thieves' and fraudsters' residences and vehicles.

        c.   It is also common for mail and identity thieves
to keep "profiles" of victims on digital devices.  Such
"profiles" contain the personal identifying information of
victims, such as names, Social Security numbers, dates of birth,
driver's license or state identification numbers, alien
registration numbers, passport numbers, and employer or taxpayer
identification numbers.

        d.   Based on my training and experience, I know that
individuals who participate in mail theft, identity theft, bank
fraud, and access device fraud schemes often have co-
conspirators, and often maintain telephone numbers, email
addresses, and other contact information and communications
involving their co-conspirators in order to conduct their
business.  Oftentimes, they do so on their digital devices.
Suspects often use their digital devices to communicate with co-
conspirators by phone, text, email, and social media, including
sending photos.

## IX. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[3]

    42.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I

---

[3] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such

know that the following electronic evidence, inter alia, is often retrievable from digital devices:

       a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

       b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat

---

as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

        c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

   43.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult

to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.     Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

44.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.     Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.     In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the

opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

2.     Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress RABULAN's, GOLDBERG's, KUEKER's, RAMIREZ's, MEIR's, BARBOUR's, and APRAHAMIAN's thumb- and/or fingers on the device(s); and (2) hold the device(s) in front of RABULAN's, GOLDBERG's, KUEKER's, RAMIREZ's, MEIR's, BARBOUR's, and APRAHAMIAN's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

3.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## X.  CONCLUSION

45.    There is also probable cause that the items to be seized described in Attachment B will be found in a search of the premises described in Attachments A-1, A-2, and A-3 of this affidavit.

46.    Further, on the basis of the evidence described herein, I submit that there is probable cause to believe that any cash and cryptocurrency such as bitcoin constitute property involved in a violation of 18 U.S.C. § 1956 is traceable to such property. I further submit that there is probable cause to believe that the cash and cryptocurrency constitute property

constituting, or derived from, proceeds obtained, directly or indirectly, as the above violations.

47. Here, because the above described property is mobile and can be easily moved, concealed, or transferred, a protective order under 21 U.S.C. § 853(e) may not be sufficient to ensure that the property remains available for forfeiture. Therefore, I request the Court to authorized seizure of the property under 21 U.S.C. § 881(a)(6) (civil forfeiture) and 18 U.S.C. § 982(a)(1) (criminal forfeiture).

David Schwartz,
Special Agent, Homeland
Security Investigations

Subscribed to and sworn before me
this \_12\_ day of March, 2019.

UNITED STATES MAGISTRATE JUDGE
ALKA SAGAR

27